UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KAREN E. BLAND-COLLINS, PH.D. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Case No. 09-0394 (RJL) |
| ) | |
| HOWARD UNIVERSITY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

MEMORANDUM OPINION
(February 7, 2014) [Dkt #82]

FILED
FEB 10 2014
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Plaintiff Karen E. Bland-Collins, Ph.D. ("Bland-Collins" or "plaintiff") filed this action against Howard University ("Howard" or "defendant") on February 26, 2009, alleging retaliation in violation of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*, wrongful discharge, and national origin discrimination in violation of 42 U.S.C. § 1981. *See* Compl. [Dkt. #1]. Plaintiff subsequently amended her Complaint, dropping her national origin discrimination claim and adding a claim for breach of implied contract. *See* Corrected Second Am. Compl. ("Compl. II") [Dkt. #95]. Before the Court is defendant's Motion for Summary Judgment. *See* Mot. Summ. J. [Dkt. #82]. Upon consideration of the parties' pleadings, the entire record in this case, and relevant law, the Court DENIES defendant's motion with respect to plaintiff's FCA whistleblower claim and GRANTS defendant's motion with respect to plaintiff's claims for wrongful discharge and breach of implied contract.

1

## BACKGROUND

In January 2006, Howard professor Loraine Fleming, Ph.D. ("Fleming"), hired plaintiff, a professional statistician, to work for one year[1] as a research associate on a grant project awarded by the National Science Foundation ("NSF"). *See* Def.'s Statement of Material Facts Not In Dispute ("Def.'s Facts") [Dkt. #82-1] ¶¶ 1–3, 9; Pl.'s Response to Def.'s Facts ("Pl.'s Facts") [Dkt. # 88-1] ¶¶ 1–3, 9; Ex. 8 to Pl.'s Opp'n to Def.'s Mot. Summ. J. (Declaration of Karen Bland-Collins, Ph.D.) ("Bland-Collins Decl.") [Dkt. # 89-6] ¶ 2. The grant project, known as the Center for the Advancement of Engineering Education ("CAEE"), was founded in 2002 with an NSF grant as a joint effort by Howard, the University of Wisconsin ("UW"), Stanford University ("Stanford"), and the Colorado School of Mines ("Colorado"). *See* Def.'s Facts ¶ 3; Pl.'s Facts ¶ 3. Fleming was the Principal Investigator ("PI") for Howard's team and had overall responsibility for Howard's contribution to the CAEE study. *See* Def.'s Facts ¶ 7; Pl.'s Facts ¶ 7.

Over the life of the grant—January 1, 2003 through March 31, 2010—NSF provided over $12 million in funding to CAEE. *See* Ex. 3 to Pl.'s Opp'n to Def.'s Mot. Summ. J. (NSF Award Abstract No. 0227558) ("Pl.'s Opp'n") [Dkt. #89-6]. UW, as the lead institution, disbursed these funds to the other grantee institutions, including defendant. Def.'s Facts ¶ 5; Pl.'s Facts ¶ 5. As PI for the Howard team, Fleming was responsible for ensuring compliance with NSF's regulations pertaining to research

---

[1] Sometime prior to January 2007, plaintiff's employment was extended through December 2007. Def.'s Facts ¶ 11; Pl.'s; Facts ¶ 11.

2

misconduct.[2]

The CAEE study at issue in this case focused on engineering students' career paths. *See* Def.'s Facts ¶ 6; Pl.'s Facts ¶ 6. Data for the study was gathered from structured interviews of undergraduate engineering students. *See* Bland-Collins Decl. ¶¶ 9–10. Fleming hired plaintiff as a research associate "to analyze the data, to define the data to be used in papers, and to develop the research paper." Def.'s Facts ¶¶ 8, 14; Pl.'s Facts ¶¶ 8, 14. Plaintiff's position was funded with a supplemental grant from NSF for performing enhanced quantitative analysis of the structured interview data. *See* Bland-Collins Decl. ¶¶ 11–12.

Plaintiff alleges that she was mistreated and forced to resign after she complained of research misconduct in connection with the CAEE study. Howard denies this, and contends that plaintiff resigned voluntarily after failing to meet a deadline for a research paper. For purposes of this opinion, I assume the following facts alleged by plaintiff to be true. Plaintiff's role on the Howard CAEE team was to analyze data collected from structured interviews that had previously been coded by other Howard team members. *See* Bland-Collins Decl. ¶ 13. In early 2006, plaintiff began to notice and document errors in the original coding. *See* Compl. II ¶¶ 18, 20. Although it was not within plaintiff's job description to code data or supervise the coding process, her concerns led

---

[2] A 2004 audit by the NSF Office of Inspector General ("OIG") found that Howard had not implemented sufficient internal controls over the management of NSF grant funds. *See* Ex. 9 to Pl.'s Opp'n at 115 (NSF OIG, Case No. 06-1-008) [Dkt. #89-6]. In response, Howard established a Research Compliance Office to ensure better stewardship of NSF grant funds and committed to train and certify all PIs on NSF grant management responsibilities. *See id.* at 55–56.

3

her to further investigate the coding underlying the data she was hired to analyze. *See id.* at ¶¶ 15–20. In March 2006, for example, plaintiff created a document enumerating over 5,000 errors in the coded data collected from structured interviews in 2004. Bland-Collins Decl. ¶ 20.

Plaintiff informed Fleming about the data integrity issues in person, by email, and in several written reports. *See* Compl. II ¶¶ 22, 24, 26–28, 33, 40; Bland-Collins Decl. ¶ 47; Exs. to Pl.'s Opp'n 17, 18, 19, 23, 27, 29, 35, 36, 43 [Dkts. ##89-7, 89-8, 89-9, 89-10]. On September 10, 2006, for example, plaintiff sent Fleming a report entitled "APS Data Analysis 2006," stressing that the 2004, 2005, and 2006 datasets could not support statistical analysis. Ex. 29 to Pl.'s Opp'n [Dkt. #89-8]. Plaintiff also made her concerns known to Fleming by refusing to use the data to support a research paper Fleming directed plaintiff to write. Bland-Collins Decl. ¶ 56. Instead, plaintiff obtained Fleming's permission to use data collected and coded by the Stanford CAEE team to support her research paper. *Id.* at ¶ 57. This paper was to be submitted to the American Society for Engineering Education ("ASEE") after Fleming's review.

In addition to complaining "numerous times [to Fleming] that Fleming's activities involved research misconduct and were wasting taxpayer resources," Pl.'s Facts ¶ 18, plaintiff expressed concerns to Janice McCain, Ph.D. ("McCain"), also on the Howard team for the CAEE Study, Pl.'s Facts ¶ 20. Plaintiff additionally discussed the coding errors with another individual on the Howard team who participated in the original coding process. Bland-Collins Decl. ¶ 47. This individual "told [plaintiff] that . . . Fleming forced [the original coders] to complete the 2004 coding in a couple of weeks

4

and that, consequently the coders, towards the end, 'just threw something together.'" *Id.*

According to plaintiff, Fleming took no action to remedy the coding errors plaintiff discovered. *See* Compl. II ¶¶ 26, 31. To the contrary, Fleming directed plaintiff in March 2006 to put aside her work on error detection and proceed with processing the 2005 dataset. *Id.* at 31; *see* Bland-Collins Decl. ¶¶ 21–22. Plaintiff warned Fleming that ignoring the issue would propagate substantial coding errors in the 2004 dataset into the 2005 dataset. Bland-Collins Decl. ¶¶ 21–22. In September 2006, however, Fleming "forbade" plaintiff from raising her concerns at a CAEE workshop in Palo Alto, California, attended by researchers from other institutions. *See* Bland-Collins Decl. ¶ 41.

In November 2006, plaintiff worked to re-code the 2004 dataset to make it suitable for statistical analysis. Bland-Collins Decl. ¶ 51. She warned Fleming, however, that there were still significant problems with the 2005, 2006, and 2007 datasets. *See* Ex. 36 to Pl.'s Opp'n [Dkt. #89-9]. Fleming was not responsive to plaintiff's concerns, which caused plaintiff "considerable stress and anxiety." Bland-Collins Decl. ¶ 54. Over the next two months, plaintiff focused on drafting her research paper. In December, she traveled to Palo Alto to work with members of the Stanford team on the paper. *Id.* at ¶¶ 57–65. On that trip, plaintiff shared with a member of the Stanford team her concerns about the integrity of the Howard datasets. *See id.* at ¶¶ 58–59; Pl.'s Facts ¶ 22.

Plaintiff did not receive the dataset from Stanford that she needed to complete her research paper until January 2, 2007. Bland-Collins Decl. ¶ 63. That same day, she informed Fleming that, due to this delay, the paper would not be ready in two days for Fleming's review. *Id.* On January 16, 2007, plaintiff submitted her completed paper to

5

Fleming. *Id.* at ¶ 69. Fleming informed plaintiff that she would not be submitting the paper to the ASEE "because she would not have time to review it and that [plaintiff] had not acted as a team player." *Id.* Two days later, plaintiff had a severe panic attack and took emergency medical leave. *Id.* at ¶ 72. When plaintiff returned to work on February 5, 2007, Fleming demanded her immediate resignation. *Id.* at ¶ 73.

## STANDARD OF REVIEW

Defendant moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. Summary judgment is proper where the pleadings, stipulations, affidavits, and admissions in a case show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court must accept as true the evidence of, and draw "all justifiable inferences" in favor of, the party opposing summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

## ANALYSIS

Upon review of the parties' pleadings, the entire record herein, and applicable law, plaintiff has presented evidence sufficient to establish a *prima facie* claim for retaliation under the FCA whistleblower protection provision. Plaintiff cannot, however, maintain her claims for wrongful discharge or breach of implied contract. Accordingly, defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part.

The FCA prohibits false or fraudulent claims for payment to the federal government. *See* 31 U.S.C. § 3729(a). Plaintiff's whistleblower retaliation claim is

based on 31 U.S.C. § 3730(h), which "entitle[s an employee] to all relief necessary to make that employee . . . whole" if the employee suffered retaliation as a result of lawful acts taken in furtherance of a suit under § 3730.³ *See* 31 U.S.C. § 3730(h). The Congressional intent behind this provision "was to 'assure those who may be considering exposing fraud that they are legally protected from retaliatory acts.'" *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998) (quoting S. Rep. No. 99–345, at 34, *reprinted in* 1986 U.S.C.C.A.N. at 5299).

To maintain a whistleblower retaliation claim, a plaintiff must establish "two basic elements: (1) acts by the employee 'in furtherance of' a suit under § 3730—acts also known as 'protected activity'; and (2) retaliation by the employer against the employee 'because of' those acts.'" *United States ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1237 (D.C. Cir. 2012) (citing *Yesudian*, 153 F.3d at 736). Our Circuit has interpreted the "protected activity" element broadly. At the time of the protected activity, the employee need not have intended to bring, nor even been aware of the possibility of bringing, an FCA claim. *Schweizer*, 677 F.3d at 1238. The appropriate inquiry is whether a plaintiff was "investigating matters that 'reasonably could lead' to a viable False Claims Act case." *Yesudian*, 153 F.3d at 740 (internal quotations and citation omitted).

The causation element of an FCA whistleblower claim turns on two issues: "(1) did 'the employer ha[ve] knowledge the employee was engaged in protected activity'; and (2) was the employer's adverse action against the employee 'motivated, at least in

---

³ Under § 3730, an FCA civil action may be brought by the Attorney General or by a private person. 31 U.S.C. §§ 3730(a)–(b).

7

part, by the employee's engaging in [that] protected activity.'" *Schweizer*, 677 F.3d at 1238 (quoting *Yesudian*, 153 F.3d at 736) (alteration in original)). As to the notice requirement, "the kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged." *Yesudian*, 153 F.3d at 742. But where the employee's "performance of [her] normal job responsibilities constitutes protected activity," the employee "must 'overcome the presumption that [she was] merely acting in accordance with [her] employment obligations' to put [her] employers on notice." *See United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1261 (D.C. Cir. 2004) (quotations and citations omitted). An employee can overcome the so-called *Martin-Baker* presumption by "acting outside her normal job responsibilities, notifying a party outside the usual chain of command, advising [her employer] to hire counsel or taking any [other] action which a factfinder reasonably could conclude would put [the employer] on notice that litigation [was] a reasonable possibility." *Schweizer*, 677 F.3d at 1239 (citations and quotations omitted).

Could a reasonable jury find that Howard discharged plaintiff because of lawful acts she took in furtherance of an FCA suit concerning falsification of federally-funded research? The answer is yes when the record is viewed in the light most favorable to plaintiff. There remains a genuine dispute as to whether: (1) plaintiff engaged in protected activity; (2) defendant was on notice; and (3) there was a causal nexus between plaintiff's protected activity and her termination. First, a reasonable jury could conclude that plaintiff's investigation and documentation of errors in the structured interview data constituted protected activity. Second, with regard to the employer notice requirement

8

and the *Martin-Baker* presumption, there is a genuine dispute as to whether plaintiff's activity went beyond the scope of the job she was hired to perform. Also relevant is plaintiff's contention that she stressed to Fleming on numerous occasions that ignoring the errors would constitute unlawful research misconduct. Third, with regard to the causal nexus requirement, plaintiff vigorously disputes defendant's contention that plaintiff voluntarily resigned after missing internal deadlines for her research paper. Accordingly, defendant's Motion for Summary Judgment is DENIED as to plaintiff's FCA whistleblower claim.

Plaintiff cannot, however, maintain her pendent wrongful discharge claim under District of Columbia law where the FCA contains an alternative remedy for the retaliation she alleges. As our Circuit has noted, "the District's *own* common law extinguishes [a wrongful discharge claim] when the statute giving rise to the public policy at issue contains an alternative remedy." *Kassem v. Washington Hosp. Ctr.*, 513 F.3d 251, 255 (D.C. Cir. 2008) (emphasis in original) (affirming dismissal of a wrongful discharge claim where an employee failed to pursue the administrative remedy provided by the Energy Reorganization Act, 42 U.S.C. § 5851). This rule applies to a wrongful discharge claim based upon the whistleblower protections of the FCA. *See Elemary v. Philipp Holzmann A.G.*, 533 F. Supp. 2d 116, 135–36 (D.D.C. 2008). Here, plaintiff's wrongful discharge claim fails because the FCA provides her an alternative remedy for the discrimination she alleges. Accordingly, defendant's Motion for Summary Judgment is GRANTED as to plaintiff's wrongful discharge claim.

With respect to her claim of breach of implied contract, plaintiff concedes that she

9

was "expressly informed that her offer of appointment was not a contract or a promise of continued employment." Def.'s Facts ¶ 9; Pl.'s Facts ¶ 9. Upon commencement of her employment, plaintiff also executed an acknowledgment form confirming her status as an "at-will" employee and disclaiming any express or implied contractual rights to continued employment. Def.'s Facts ¶ 10; Pl.'s Facts ¶ 10. Plaintiff does not present any argument or otherwise oppose defendant's arguments with respect to this claim. Accordingly, defendant's Motion for Summary Judgment is also GRANTED as to plaintiff's breach of implied contract claim.

## CONCLUSION

For all the foregoing reasons, defendant's Motion for Summary Judgment is DENIED with respect to plaintiff's FCA whistleblower claim. Defendant's Motion for Summary Judgment is GRANTED with respect to plaintiff's claims for wrongful discharge and breach of implied contract. An Order consistent with this decision accompanies this Memorandum Opinion.

_____
RICHARD J. LEON
United States District Judge